■ GARLAND D. COX & ASSOCIATES, INC., Respondent, v HARRY S. KOFF-MAN et al., Appellants, and PENN CENTRAL TRANSPORTATION COMPANY et al., Respondents.—Appeal from a judgment of the Supreme Court in favor of petitioner, entered February 24, 1978 in Broome County, upon a decision of the court at a Trial Term, without a jury. Petitioner Cox seeks to compel the appellants (Koffman Group), pursuant to CPLR 5225 (subd [b]) and 5227, to pay Cox money owed to Cox' judgment debtor, the P.D.C. Corporation (P.D.C.), by the Koffman Group. This matter is before us on remand from the Court of Appeals, which held that this court's prior holding that Cox could not secure a turnover order directed to the Koffman Group because there had not been a levy of execution against the assets of the debtor, P.D.C., held by the Koffman Group was in error (see *Cox & Assoc. v Koffman,* 67 AD2d 1025, revd 48 NY2d 878). It is necessary to consider several issues which become relevant in this proceeding in view of the court's ruling. The issues stem from a convoluted set of facts which evolved from transactions between the litigants in these proceedings. The trial court found that Cox was entitled to have a conveyance by P.D.C. of a management contract between P.D.C. and the Koffman Group to Bella Vista set aside as a fraudulent conveyance to the extent necessary to satisfy its judgment, that the management contract was not terminated at the time of the entry of judgment by Cox in accordance with its terms and that there was enough money in the custody or control of the Koffman Group in which P.D.C. had an interest under the management contract to satisfy Cox' judgment. It also held that Cox had a superior right as a judgment lien creditor over that of the Koffman Group as the claimed holder of an unperfected collateral security agreement with regard to which a Uniform Commercial Code financing statement was never filed, and it directed the Koffman Group to turn over to Cox $75,237.32. The trial court found that the sum of $27,270.81, applied by the Koffman Group in foreclosure of its security on the Garden Village Plaza transaction, and the amount of $15,877.81, held by the Koffman Group in a maintenance and repair escrow account, plus moneys received from Conrail after March 26, 1976, were all reachable by Cox as judgment creditors of P.D.C. The series of events leading to this controversy commenced on April 5, 1971 when P.D.C. entered into an agreement with Penn Central Transportation Company (Penn). P.D.C. was to construct, maintain and operate a dormitory for Penn employees located at Collinwood, Ohio. P.D.C. received a ground lease for the property on which the dorm was to be constructed for 15 years, renewable

at P.D.C.'s option for five more years. Penn was to pay rent on completion. P.D.C. constructed the dormitory. It had hired Cox to design the facility. Cox was never paid by P.D.C. On July 3, 1972, P.D.C. assigned its lease to the Koffman Group for $750,000 cash and a $500,000 mortgage. The mortgage was secured by the lease and the dormitory as collateral. The mortgage agreement provided that the mortgage principal would come due only if P.D.C. exercised the option to repurchase included in its assignment to the Koffman Group. Should the option be exercised, P.D.C. would pay $875,000 cash and cancel the debt evidenced by the mortgage. Interest was to be payable by the Koffman Group on the mortgage. Interest was, however, never paid by the Koffman Group. Cipolla was an officer and major shareholder of P.D.C. At the same time, the parties entered into a management agreement as to the property, which provided that P.D.C. was to manage it for the Koffman Group and to collect rents from Penn. From these moneys, P.D.C. was to pay for maintenance expenses and interest due on the $500,000 mortgage to P.D.C. The Koffman Group was guaranteed $90,000 a year. The remainder of up to $100,000 was payable to P.D.C., and any further revenue was to be split evenly with the Koffman Group for its services. Paragraph 19 of the contract provided that in the event of certain specified defaults by P.D.C., the Koffman Group would have the right to cancel the contract on 30 days' written notice. P.D.C. subcontracted the daily maintenance aspects of the contract to P&R Management Company. On January 26, 1973, P.D.C. assigned to the Koffman Group its rights and repurchase option under the July 3, 1972 management agreement as security for the performance and payment of its obligations under the Lancer Court Corporation's agreement with the Koffman Group. Lancer Court was also owned by Cipolla. On January 29, 1976, P.D.C. assigned the same collateral to the Koffman Group to secure the performance of its obligation relating to the Garden Village Plaza. Cipolla also owned the Plaza. Uniform Commercial Code filings were not made to perfect either of these security interests. On November 4, 1974, Cox sued P.D.C. for its architectural fees. Thereafter, on March 1, 1975, P.D.C. assigned all its rights under the management agreement contract with the Koffman Group to Bella Vista Apartments, Inc. (Bella Vista). Under the agreement, Bella Vista was not responsible for any prior obligations incurred by P.D.C., but only as to obligations incurred thereafter. No consideration accompanied this transfer. Cipolla was an officer of Bella Vista and his children its stockholders. When the assignment was made, P.D.C. was in dire financial difficulties and virtually insolvent. The management contract was its sole source of assets. Conrail, successor to Penn, stopped making payments under the management contract to P.D.C. Cipolla advised Conrail that the transfer to Bella Vista was to ease his tax problems. The Koffman Group and Cipolla assented in writing to the transfer on May 1, 1975. Payments were resumed by Conrail to Bella Vista. On June 18, 1975, Cox took a default judgment against P.D.C. for $65,430, which was recorded on June 18, 1975. Conrail once again stopped payments when dissatisfaction arose over Bella Vista's management. The Koffman Group took over as agent to receive and pay over the moneys due from Conrail as per the management agreement. Cipolla agreed to this arrangement on behalf of Bella Vista by letter. The remaining duties under the management contract remained the same. Conrail paid the Koffman Group $78,000 previously withheld under the management contract. Cipolla continued, despite the letter agreement, to actively participate in the management of the Collinwood Facility. No moneys were paid by the Koffman Group to Bella Vista or to P.D.C. despite

the contents of the letters of agreement which said that the Koffman Group would disburse the moneys to (a) payments due Koffman and others under the July 3, 1972 management agreement; (b) to P&R Management for management bills, for arrearage and current and future billings and any other bills pertaining to maintenance and (c) the balance to Bella Vista or its assignee. It is uncontested that sometime after January, 1974, Garden Village defaulted in its obligations under its contract with the Koffman Group. The Koffman Group foreclosed on the collateral securing the performance of Garden's contract and applied $27,270.81 of payments from Conrail due to P.D.C. during the period January 26, 1976 to March 24, 1976 to this end. On March 4, 1976, Cox delivered an execution to the Sheriff directing that assets of P.D.C. be seized and served the Koffman Group and Conrail with restraining notices on March 6, 1976 in an attempt to satisfy its judgment. The first argument raised by the Koffman Group is that the trial court erred in concluding that the assignment of the management agreement by P.D.C. to Bella Vista was fraudulent in violation of section 273, and possibly section 276, of the Debtor and Creditor Law. We disagree. Section 273 provides that a conveyance by an insolvent is fraudulent if incurred without a fair consideration. The record amply supports the finding that P.D.C. was insolvent at the time of the March 1, 1975 assignment. Crucial, then, is whether there was fair consideration to legitimize the transfer. The only consideration alluded to is Bella Vista's agreement to assume all of P.D.C.'s obligation under the agreement, arising after March 1, 1975. This clause did not obligate Bella Vista to do anything more than it was obliged to do under contract law and does not constitute fair consideration (*Tanbro Fabrics Corp. v Deering Milliken*, 35 AD2d 469, affd 29 NY2d 690). Cipolla owned both P.D.C. and Bella Vista. The assignment of P.D.C.'s only valuable asset just three months before a default judgment against it was taken was clearly fraudulent and correctly found to be so by the court. Under section 278 (subd 1, par a) of the Debtor and Creditor Law, Cox was entitled to have the conveyance from P.D.C. to Bella Vista set aside to the extent necessary to satisfy his claims. The court also correctly concluded further that P.D.C.'s management contract with the Koffman Group was still in effect when Cox entered his judgment because there were no grounds established in the record for its termination. The Koffman Group attempted to terminate the contract on March 26, 1976, some 20 days after restraining orders were served upon the Koffman Group directing them not to transfer funds of P.D.C. The management contract between P.D.C. and Koffman expressly required 30 days' notice for termination and allowed for termination upon certain specific grounds. No existing grounds for termination were made out in the record. An attempt to terminate the contract after Cox' restraining notices were served on the Koffman Group was tantamount to a fraud. Parties may not cancel a contract when to do so would be fraudulent (15 Williston, Contracts [3d ed], § 1886). The Koffman Group urges that the trial court improperly held that the sum of $27,270.81 applied by the Koffman Group in foreclosure of its security on the Garden Village Plaza transaction, and the $15,877.81 set aside in escrow by Koffman for contemplated maintenance and repair costs under the management, together with sums received from Conrail after March 26, 1976 when the Koffman Group attempted to terminate the Bella Vista contract, were all reachable by Cox under CPLR 5225 (subd [b]) and 5527. The Koffman Group urges that as part of its management duties it could set aside, and properly did so, a maintenance escrow fund and that this fund is not reachable by petitioner. We conclude as to the $15,877.81 held by the Koffman Group in escrow that

the letter of agreement dated November 18, 1975, which set out the Koffman Group's obligations, did not authorize such a fund. The Koffman Group was required to pay out these moneys to P.D.C. This sum was, therefore, reachable by Cox. The question of the attachability of $27,270.81, which the Koffman Group urges it had validly seized on its unperfected security interest before Cox secured a judgment pursuant to CPLR 5201 (subd [a]), is mooted by the fact that the amount accumulated by the Koffman Group from March 26, 1976 to August 30, 1977, plus the $15,877.81 escrow account, exceeds the amount necessary to satisfy Cox's judgment. We need not, therefore, address the question of whether this fund was additionally reachable by Cox. Judgment affirmed, with costs to petitioner. Mahoney, P. J., Sweeney, Mikoll and Herlihy, JJ., concur.